UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Morrow Equipment Co., LLC; Fly & Form Structures, Inc., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:21-cv-530-BHH |
| v. | ) ) | **Opinion and Order** |
| HCC Specialty Insurance Company, n/k/a Tokio Marine Grv Re, Inc., | ) ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

This matter is before the Court on Plaintiffs Morrow Equipment Co., LLC's ("Morrow") and Fly & Form Structures, Inc.'s ("Fly & Form") (collectively, "Plaintiffs") motion for partial summary judgment, (ECF Nos. 61, 64), and Defendant HCC Specialty Insurance Company n/k/a Tokio Marine Grv Re, Inc.'s ("HCC" or "Defendant") motion for summary judgment, (ECF No. 60). For the reasons set forth below, the Court denies Plaintiffs' motion for partial summary judgment, (ECF Nos. 61, 64), and grants Defendant's motion for summary judgment (ECF No. 60).

I.      **BACKGROUND**

This insurance dispute arises from the death of a man while working on a construction project known as Courier Square (hereinafter the "Project") in Charleston, South Carolina. The owner and general contractor of the Project was Greystar Development & Construction, L.P. ("Greystar"). Greystar contracted with Fly & Form to provide concrete and form work for the Project. (ECF No. 60-5, Ex. D at Exs. 4 & 9.) Pursuant to the subcontract with Greystar, Fly & Form was responsible for leasing,

securing assembly of, and operating two cranes on the Project. (*Id.*) In turn, Fly & Form leased a tower crane from Morrow in connection with Fly & Form's work on the Project. (*Id.* at Ex. D at Ex. 20.)

HCC was the insurer of Greystar for the Project. HCC issued a commercial general liability insurance policy, No. S14PC30016-00, to Greystar. (hereinafter, the "Policy") (ECF No. 60-2.) The Policy provided wrap-up, or Owner Controlled Insurance Program ("OCIP") coverage for the Project via a General Change Endorsement No. 33. (ECF No. 60-3.) As required by the subcontract between Fly & Form and Greystar, Fly & Form enrolled in the OCIP through Mountain West Series of Lockton Companies, LLC ("Lockton"). On December 12, 2015, Lockton informed Fly & Form that it had "successfully completed the steps for enrollment into the [] Project" and issued a certificate of insurance to Fly & Form. (ECF No. 60-5, Ex. D at Exs. 11 & 12.) As an enrollee in the OCIP, it is undisputed that Fly & Form was **insured** under the Policy. (ECF No. 64 at 3; ECF No. 68 at 9.) It is also undisputed that Morrow did **not** enroll in the OCIP. (ECF No. 60-1 at 7; ECF No. 64 at 9, n.8.)

The lease agreement between Plaintiffs required that Fly & Form defend, indemnify, and hold Morrow harmless from claims and liabilities arising from the lease agreement. (ECF No. 60-5, Ex. D at Ex. 20 at p. 2.) The agreement also required Fly & Form to carry liability insurance with Morrow as an additional insured. (*Id.*) On November 18, 2015, Sterling Risk Advisors issued a certificate of insurance to Morrow, identifying Morrow as an additional insured on policies issued by, *inter alia*, Landmark and Travelers to Fly & Form. (ECF No. 60-5, Ex. D at Ex. 19.)

During the assembly of a tower crane at the Project, a metal pin fell from the tower, striking Ignacio Barriga-Herrera, who was working 180 feet below. Arising from the death of Mr. Barriga-Herrera, two South Carolina state court lawsuits were filed (the "Underlying Lawsuits"),[1] in which Plaintiffs were named as defendants, along with Greystar and other OCIP insureds. HCC defended Greystar and Fly & Form in the Underlying Lawsuits and ultimately settled the claims against them in October of 2019. HCC did not defend or indemnify Morrow in the Underlying Lawsuits. Rather, Fly & Form, pursuant to its lease agreement with Morrow, accepted Morrow's defense and indemnity request. Thus, Fly & Form paid for the defense of Morrow and to settle the claims against Morrow.

On June 16, 2023, Plaintiffs filed a second amended complaint against HCC. (ECF No. 57.) Therein, Plaintiffs assert breach of contract and bad faith claims based largely on HCC's denial of coverage for Morrow and estoppel and waiver claims based on HCC's alleged failure to timely issue a denial of insurance coverage letter to Morrow and to provide Fly & Form with a sufficient reservation of rights letter. (*Id*.) On August 31, 2023, Plaintiffs filed a motion for partial summary judgment against HCC, alleging that HCC breached the Policy when it refused to defend and indemnify Morrow in the Underlying Lawsuits. (ECF No. 64.) [2] Plaintiffs contend that Morrow was entitled to coverage as an additional insured under the Policy and, therefore, HCC had a duty to defend and indemnify Morrow in the Underlying Lawsuits. (*Id*.) On September 22, 2023, HCC responded, (ECF No. 68), and on October 13, 2023, Plaintiffs replied. (ECF No. 75.)

---

[1] Case Nos. 2017-CP-10-5416; 2018-CP-10-3403.
[2] Plaintiffs did not seek summary judgment as to their bad faith claims, stating that "such issues are a question reserved for the jury." (ECF No. 64 at 5, n.6.)

On August 24, 2023, HCC filed a motion for summary judgment against Plaintiffs as to all claims. (ECF No. 60-1.) HCC contends that Plaintiffs' breach of contract and bad faith claims fail as a matter of law because HCC owed no coverage to Morrow; had a reasonable basis upon which to deny coverage to Morrow; did not fail to timely provide the reasons for its coverage position; and did not fail to timely and fairly resolve the Underlying Lawsuits against Fly & Form. (*Id.*) Lastly, HCC argues Plaintiffs have failed to meet their burden to prove that HCC should be estopped from denying coverage to Morrow or that HCC waived its right to deny coverage to Morrow. (*Id.*)  On September 22, 2023, Plaintiffs responded, (ECF No. 69), and on October 13, 2023, HCC replied. (ECF No. 74.)

This matter is now ripe for the Court's review.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, "'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 190 (4th Cir. 1997) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

Any reasonable inferences are to be drawn in favor of the nonmoving party. *Anderson*, 477 U.S. at 255; *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. *See Anderson*, 477 U.S. at 252; *Stone*, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the fact finder could reasonably decide in his favor,

then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

## III.    ANALYSIS

"The parties [] agree that the central issue, which bears directly on almost all of the rest, is whether Morrow was an additional insured under the Policy." (ECF No. 69 at 3.) In South Carolina, a party seeking coverage has the burden to show that it is an insured. *State Farm Mut. Auto. Ins. Co. v. Logan*, 444 F. Supp. 2d 622, 626 (D.S.C. 2006) (citing *United States Fire Ins. Co. v. Macloskie*, 465 S.E.2d 759, 760 (1996)). Thus, the Court must analyze whether Plaintiffs have met their burden to show that the terms of Greystar's Policy issued by HCC extend coverage to Morrow as an additional insured under the Policy.

### A.  Breach of Contract Claim

In their motion for partial summary judgment, Plaintiffs argue that HCC had a duty to defend Morrow in the Underlying Lawsuits on two alternative grounds. First, they contend that the Policy covered Morrow – by virtue of Morrow leasing cranes to Fly & Form – as an additional insured pursuant to the "Additional Insured – Lessor of Leased Equipment – Automatic Status When Required in Lease Agreement with You" endorsement (hereinafter, the "AI Endorsement"). (ECF No. 64 at 4, 23.) Stated another way, Plaintiffs argue that under the plain language of the Policy, the AI Endorsement applied to Fly & Form, thereby triggering coverage for Morrow. (*Id.* at 9-18.) In the alternative, Plaintiffs contend the Policy is ambiguous as written and, therefore, must be construed against HCC and in favor of coverage for Morrow.

HCC responds that Morrow was not covered under the Policy because Morrow was neither a Named Insured, an enrollee in the OCIP, nor an additional insured under

the Policy. (ECF No. 68 at 2-4.) HCC further asserts that Fly & Form did not qualify as a Named Insured under the Policy; therefore, Fly & Form's contractual privity with Morrow did not trigger additional insured status for Morrow under the Policy's AI Endorsement. (*Id*.) Accordingly, HCC contends that it properly denied coverage to Morrow and is entitled to summary judgment in its favor on Plaintiffs' breach of contract claim. (*Id*.)

### Coverage Under the Policy

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." *Auto Owners Ins. Co. v. Rollison*, 663 S.E.2d 484, 487 (2008). "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Beaufort Cnty. Sch. Dist. v. United Nat'l Ins. Co*., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing *Schulmeyer v. State Farm Fire & Cas. Co*., 579 S.E.2d 132, 134 (2003)). "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." *Id*. (citing *Schulmeyer*, 579 S.E.2d at 134). However, an insurance contract which is "in any respect ambiguous or capable of two meanings" must be construed strictly against its drafter, the insurer. *Reynolds v. Wabash Life Ins. Co*., 161 S.E.2d 168, 169 (1968).

Although the Policy is an insurance contract between HCC, the insurer, and Greystar, a Named Insured, (*see* ECF No. 60-2 at Ex. A), Plaintiffs claim Morrow is entitled to coverage as an additional insured under the Policy. The AI Endorsement in Section II of the Policy governs the addition of an organization as an "additional insured" under the Policy. It provides:

> **Who Is An Insured (Section II)** is amended to include as an additional insured any person or organization for whom **you** lease equipment when **you** and such person or organization have agreed **in writing in a contract or agreement** that such person or organization be added as an additional insured on [this] policy. Such person or organization is an insured only with respect to liability for 'bodily injury' . . . caused, in whole or in part, by **your** maintenance, operation or use of equipment leased to **you** by such person or organization.

(ECF No. 60-2 at Ex. A at p. 53 (emphasis added)). Plaintiffs contend that the AI Endorsement "establish[es] as an additional insured any organization who leases equipment to **an insured** where the contract or agreement provides that the lessor be added as an additional insured with respect to liability for bodily injury." (ECF No. 64 at 3) (emphasis added). Thus, because Fly & Form was **an insured** under the Policy, Plaintiffs contend that Fly & Form was covered by the AI Endorsement which, in turn, made Morrow an "additional insured" by virtue of leasing the cranes for the Project to Fly & Form.

In response, HCC contends that "you" and "your" in the AI Endorsement refer to Greystar, who is identified as a Named Insured in the Declarations. (ECF No. 60-1 at 4, 19.) HCC points to the Policy, which states: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under the policy." (ECF No. 60-2 at 21.) HCC further contends that Fly & Form does not qualify as a Named Insured under the policy. (ECF No. 60-1 at 18.) HCC notes that it is undisputed that the Named Insured shown in the Declarations is Greystar Development & Construction, L.P. (ECF No. 60-2 at 4.) Read in this sense, to be covered as an additional insured under the AI Endorsement, the party seeking coverage must have agreed in writing in a contract or agreement with **Greystar** that required **Greystar** to add the party as an additional insured on its Policy issued by HCC. HCC also notes that there is no dispute that Greystar did not contract with Morrow;

8

rather, Greystar contracted with Fly & Form. (ECF No. 60-5, Ex. D at Exs. 4 & 9.) Fly & Form, in turn, contracted with Morrow for lease of a tower crane. (*Id.* at Ex. 20.) Further, the parties do not dispute that the contract between Greystar and Fly & Form did not require Greystar to obtain insurance for any of Fly & Form's equipment/material suppliers, such as Morrow. (*Id.* at Ex. 9.) Thus, according to HCC, because there was no contractual privity between Morrow and Greystar, as required by the plain language of the AI Endorsement, Morrow was not entitled to additional insured status under the Policy. (ECF No. 60-1 at 17-22.)

To construe the AI Endorsement, the Court must first consider how the Policy describes and delineates between the parties and their interests. The contracting parties obviously each have tangible interests. Here, the Declarations identify HCC, the insurance company, and Greystar, who is identified as a Named Insured. (ECF No. 60-2 at 4.) The part of the Policy describing liability coverage, which is entitled "Commercial General Liability Coverage Form" (the "General Liability Form"), also identifies various individuals with interests under the Policy. (*Id.* at 21-70.) In its preamble, the General Liability Form notes:

> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.
>
> The word "insured" means any person or organization qualifying as such under Section II—Who is An Insured.

(*Id.* at 21.) The preamble, therefore, sets out a distinction between "Named Insured" and someone who is an "insured." *See, e.g., Great Am. All. Ins. Co. v. Windermere Baptist Conf. Ctr., Inc.*, No. 2:16-CV-04046-NKL, 2017 WL 2869945, at *12 (W.D. Mo. July 5,

2017) (Missouri law) (analyzing identical policy language and stating that the "fact that the policy differentiates between the two statuses shows that they are different terms" and, therefore, rejecting argument that "all insureds named are 'Named Insureds'"). As correctly noted by Plaintiffs, the Policy does not define who is a "Named Insured." (*See generally* ECF No. 60-2.) However, in various provisions, the Policy places that term in context by using phrases such as "the Named Insured shown in the Declarations" (*id.* at 21); "[a]ny organization you newly acquire or form . . . will qualify as a Named Insured . . . that is not shown as a Named Insured in the Declarations" (*id.* at 30); and "[a]udit premiums are due and payable on notice to the first Named Insured." (*Id.* at 44.) Since Greystar purchased the Policy and was the only insured identified in the Policy's Declarations, the Court concludes – and the parties do not dispute – that a plain and reasonable interpretation of the Policy is that Greystar is a Named Insured. Further, it is undisputed that: (1) Fly & Form is not identified as a Named Insured in the Declarations or elsewhere in the Policy; (2) Plaintiffs are not organizations newly acquired or formed by Greystar (or any other entity identified as a Named Insured under the Policy); and (3) Plaintiffs do not otherwise qualify as an insured under the **unmodified** version of Section II of the General Liability Form. (*See id.* at 29-30.) ꜟ

Thus, to resolve the present issue, the Court must focus on two endorsements that change the Policy. The first endorsement is General Change Endorsement No. 33. (ECF No. 60-3.) Endorsement 33 modifies Section II – WHO IS AN INSURED to include: "Your 'enrolled contractors' only while performing duties related to the 'covered project.'" (ECF No. 60-3, at p. 7.) This Endorsement defines "Enrolled Contractors" as "contractors who, prior to the commencement of their work on the covered project, have completed the

appropriate enrollment[] documents for the 'covered project.'" (*Id.*) The parties do not dispute that Fly & Form was an Enrolled Contractor.[3] (ECF No. 64 at 3; ECF No. 60-1 at 6-7.) Thus, the Court concludes that Fly & Form's interests under the Policy are created and described by Section II – Who Is An Insured, as modified by Endorsement No. 33, which identifies Fly & Form as an "insured" under the Policy, not a Named Insured.[4]

The second endorsement modifying Section II – WHO IS AN INSURED is the AI Endorsement. (ECF No. 60-2 at 53.) The AI Endorsement modifies this Section

> to include as an additional insured any person or organization from whom **you** lease equipment when **you** and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on **your** policy. Such person or organization is an insured only with respect to liability for 'bodily injury' . . . caused, in whole or in part, by **your** maintenance, operation or use of equipment leased to **you** by such person or organization.

(*Id.*) (emphasis added.) As noted above, the Policy plainly states that "the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under the [P]olicy." (ECF No. 60-2, Ex. D at 21.) This phrase in the AI Endorsement – "on **your** policy" – can only refer to Greystar's Policy issued to it by HCC, as the owner and general contractor for the Project. (*Id.*) (emphasis added.) Indeed, Fly & Form had its own commercial general liability policy issued to it by another insurance company. (ECF No. 64 at 5.) If "you" and "your" was

---

[3] While Plaintiffs rely on a certificate of insurance ("COI") it received from Lockton (the administrator of the OCIP) after enrolling that showed it was a named insured under the Policy, (*see* ECF No. 64 at 3, 11-12; ECF No. 64-2 at 1.), they seemingly acknowledge that this "COI does not create or expand coverage not provided for in the [P]olicy itself." (ECF No. 64 at 12 n.14). Indeed, the Court finds that this COI does not grant Named Insured status to Fly & Form under the Policy and that any reliance upon this COI by Fly & Form **as to its status or rights under the Policy** is unreasonable. *See, e.g., Dan Ryan Builders W. Virginia, LLC v. Main St. Am. Assurance Co.*, 452 F. Supp. 3d 338, 353-55 (D.S.C. 2020).

[4] It is also undisputed that the Named Insured shown in General Change Endorsement No. 33 is Greystar Development & Construction, L.P. (ECF No. 60-3 at 2.) This Endorsement also named several additional Named Insureds – capital N and capital I – to include Courier Square Project I Owner LLC. (*See id.* at pp. 2 & 6.)

referring to those qualifying as an insured under the modified version of Section II of the General Liability Form, then this provision would permit all Enrolled Contractors, by virtue of written equipment lease contracts or agreements they sign with other persons or organizations, to vastly expand coverage from Greystar's carrier without notice to Greystar or its carrier. This cannot be. The Policy protects against such expansion by providing additional insured coverage to only those persons or organizations with whom **Greystar** (or another Named Insured) agreed, in a written contract or agreement, to add as an additional insured under the Policy. Thus, the Court finds that the language of the Policy clearly and unambiguously requires that a Named Insured execute a written contract or agreement with the party seeking coverage as an additional insured under the Policy's AI Endorsement. *See Sunex Int'l, Inc. v. Travelers Indem. Co. of Ill.*, 185 F. Supp. 2d 614, 617 (D.S.C. 2001) (holding that courts "must give policy language its plain, ordinary, and popular meaning"). As such, Fly & Form's agreement with Morrow does not afford Morrow coverage as an additional insured under the plain language of Greystar's Policy. Because Greystar never agreed in writing with Morrow to add Morrow as an additional insured under the Policy, the AI Endorsement does not provide additional insured coverage to Morrow.

While not binding, Plaintiffs rely on a Tenth Circuit case, *Marathon Ashland Pipeline LLC v. Maryland Cas. Co.*,[5] to bolster its position that "you" and "your" in the AI Endorsement also refers to insureds, like Fly & Form, such that Morrow is entitled to coverage as an additional insured. (*See* ECF No. 64 at 14-18.) In *Marathon*, Maryland Casualty Insurance Company issued a commercial liability policy to a building erection

---

[5] 243 F.3d 1232 (10th Cir. 2001).

company, Steel Structures, Inc., a subcontractor, which contained an endorsement provision to name Marathon, the general contractor, as an additional insured. The endorsement stated that "WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule." *Marathon*, 243 F.3d at 1236-43. The court determined that "[t]his amendment, by its own language, adds Marathon as an 'insured,' and does not relegate it to a lesser status than named insured under the policy." *Id.* at 1241.

Here, the endorsement is different. The AI Endorsement amends Section II "Who Is An Insured" "to include as an additional insured any person or organization **from whom you lease equipment when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy**." (ECF No. 64-15 at 52.) (emphasis added.) It further provides that an additional insured is covered "only with respect to liability for bodily injury, property damage, or personal and advertising injury caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person or organization." (*Id.*) The Court finds this provision unambiguous: coverage exists for liability caused by a Named Insured's maintenance, operation or use of the leased equipment where a Named Insured and the lessor of the leased equipment have agreed in a written contract or agreement to add the lessor of the leased equipment as an additional insured on the Named Insured's Policy. Unlike in *Marathon*, the language of the AI Endorsement specifically limits the additional insured's coverage and explicitly requires direct privity between a Named Insured and the person or organization seeking

coverage as an additional insured.[6] The AI Endorsement further states when such insured status ends: "A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends." (ECF No. 64-15 at 52.) Thus, the Court can readily ascertain how additional insureds are classified under the Policy – as insureds only as to liability coverage, not Named Insureds, and only while the leasing contract or agreement with a Named Insured is in effect. This reasonable interpretation of the AI Endorsement is consistent with the recognized general purpose of an additional insured endorsement: "An additional insured provision is designed 'to protect parties who are not named insureds from exposure to vicarious liability for acts of the named insured.'" *Gemini Ins. Co. v. Delos Ins. Co.*, 211 Cal. App. 4th 719, 723 (2012) (quoting *Maryland Cas. Co. v. Nationwide Ins. Co.*, 65 Cal. App. 4th 21, 31 (1998)). Accordingly, the Court is not persuaded by Plaintiffs' argument based on *Marathon.*

As to their alternative argument in favor of coverage for Morrow, Plaintiffs point to three sections of the Policy and argue that each section demonstrates that the words 'you' and 'your' as defined above in the Policy are ambiguous and illusory. (ECF No. 64 at 18-20; ECF No. 75 at 4-8.) The Court addresses each section in turn.

First, Plaintiffs rely on the August 29, 2017, reservation of rights ("ROR") letter HCC sent to Fly & Form. (ECF No. 64-13.) Therein, HCC directed Fly & Form to Section IV of the Policy, entitled "Commercial General Liability Conditions," specifically Part 2,

---

[6] *E.g., Travelers Prop. Cas. Co. of Am. v. Harleysville Worcester Ins. Co.*, No. 22 CIV. 2171 (KPF), 2023 WL 4896169, at *9 (S.D.N.Y. Aug. 1, 2023) (collecting cases with like additional insured language in which courts found language explicitly required direct privity); *State Auto Prop. & Cas. Ins. Co. v. KIN, Inc.*, 588 F. Supp. 3d 870, 875 (N.D. Ill. 2022) (finding that "by using the text 'when you and such person or organization,' the contract expressly required direct privity of contract").

entitled "Duties In The Event of Occurrence, Offense, Claim or Suit," and HCC quoted

Part 2 in full its letter. (*Id.* at 2-3.) In pertinent part, Part 2 states:

> **a.** You must see to it that we are notified . . .
>
> **b.** If a claim is made or 'suit' is brought against any insured, you must: . . .
>
> **c.** You and any other involved insured must: . . . **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the 'suit' . . . .

(*Id.*) At the end of its letter, HCC stated: "Per the policy conditions, you are required to

cooperate in the investigation of this matter." (*Id.* at 5.) Plaintiffs contend that "[c]learly,

HCC did not intend to define 'you' as only Greystar and/or Courier Square in this cited

section of the OCIP Policy. In fact, it stated the opposite." (ECF No. 64 at 19.)

　　　The Court does not agree that the language in Part 2 renders "you" and "your" as

defined in the Policy ambiguous, or that HCC "stated the opposite" in its letter to Fly &

Form. To the contrary, it finds that this language further supports that there is a distinction

between those who are a "Named Insured" (and referred to as "you" and "your") and those

who are insureds under the Policy. For example, Part 2, subsection c. states "You and

any other involved insured," – the "you" is a Named Insured under the Policy, such as

Greystar or Courier Project, and then there are others who qualify as insureds under the

Policy, like Fly & Form (as an Enrolled Contractor). This interpretation is supported by

HCC's actions in quoting Part 2 in full and also in quoting Endorsement No. 33 in its letter,

specifically, "**Section II – Who Is An Insured, 2.** . . . **e.** Your 'enrolled contractors.'" (ECF

No. 64-13 at 5) (emphasis in original.) In doing so, HCC provided Fly & Form with all the

relevant policy language establishing Fly & Form's status as an **<u>insured</u>** under the Policy

and setting forth Fly & Form's duty pursuant to the Policy – as an "involved insured" – to cooperate in the investigation. Thus, the Court finds this argument lacks merit.

Plaintiffs next argue that the Policy's "Exclusion – Wrap-Up Cross Suits With Exception To Owner and General Contractor" endorsement would be "wholly superfluous" if "you" and "your" only applied to Greystar and Courier Project. (ECF No. 64 at 20-21; Ex. 64-15 at 39.) This endorsement excludes insurance coverage for:

> 'Property damage' arising from claims or 'suits' brought by any Named Insured identified in the declarations or policy as a Named Insured against any other Named Insured identified in the declarations or policy as a Named Insured. This exclusion does not apply to the Owner or General Contractor.

(Ex. 64-15 at 39.)

The Court first notes that it does not find HCC to be arguing that the **only** Named Insureds are Greystar and Courier Project. (*See, e.g.,* ECF No. 68 at 7.) Rather, HCC states that Greystar is the Named Insured in the Policy's Declarations and argues that there is no language in the Policy to support that Fly & Form is also a Named Insured such that the "you" and "your" apply to it. Regardless, it is undisputed that, in addition to Greystar and Courier Square Project (general contractor/owners), eighteen (18) other organizations are identified in the Policy as a "Named Insured." (*See* ECF No. 60-3 at 2, 6.) Given the addition of several entities as Named Insureds under the Policy, that are **not** identified as a general contractor or an owner, it is evident why this exclusion endorsement was made part of the Policy. Thus, the Court finds this argument lacks merit.

Lastly, Plaintiffs argue that language in the Common Policy Conditions of the Policy creates ambiguities. (ECF No. 75 at 6). Specifically, Plaintiffs point to: "[y]our rights and duties under this policy may not be transferred without [HCC's] written consent except in the case of death of an individual named insured . . ." (ECF No. 64-15 at 4); and

"[i]nsured will have the ability to add projects . . . . Upon request . . . HCC will: a. Add requested LLC to Wrap Up Project Change Endorsement as a 1st Named Insured . . . ." (*Id.* at 69.)

Based on a plain reading of these conditions, Named Insureds cannot transfer their rights and privileges, and insureds, like Fly & Form, can request HCC to add a project. The Court does not agree that the Policy is ambiguous simply because "HCC testified that . . . it did not believe Enrolled Contractors had the ability to transfer their rights and privileges under the Policy," and Plaintiffs' counsel's "review of the Policy show[ed] no other provision" granting this ability to Enrolled Contractors. (ECF No. 75 at 6.) Further, the Court declines to find ambiguity simply because Plaintiffs believe the latter language, which was added via an endorsement, "appears to be directed towards Greystar." (*Id.*) Whether a contract is ambiguous is to be determined from examining the entire contract, not by reviewing isolated portions of the contract. *Farr v. Duke Power Co*., 218 S.E.2d 431 (1975); *Silver v. Abstract Pools & Spas, Inc*., 376 S.C. 585, 658 S.E.2d 539 (Ct. App. 2008). Accordingly, the Court finds this excerpted language does not render the definition of "you" and "your" in the Policy ambiguous.

In sum, the Court holds that the policy language at issue here simply is not ambiguous. Ambiguity, like beauty, may lie solely in the eye of the beholder—and so it is here. Consequently, the Court is limited to the four corners of the Policy in determining for what and to whom it affords coverage. *See, e.g., Oceola Dev. & Constr., LLP v. Int'l Ins. Co. of Hannover, PLC*, No. 2:19-cv-0739-DCN, 2020 WL 1677539, at *3 (D.S.C. Apr. 6, 2020) ("'[I]f the intention of the parties is clear, courts have no authority to torture the meaning of policy language to extend coverage that was never intended by the parties.'"

(quoting *S.C. Farm Bureau Mut. Ins. Co. v. Wilson*, 544 S.E.2d 848, 850 (S.C. Ct. App. 2001))); *Silver v. Aabstract Pools & Spas, Inc.*, 658 S.E.2d 539, 542 (Ct. App. 2008) ("'[T]he intention of the parties and the meaning are gathered primarily from the contents of the writing itself, or, as otherwise stated, from the four corners of the instrument . . . .'" (quoting *McPherson v. J.E. Sirrine & Co.*, 33 S.E.2d 501, 509 (1945))). And, for the reasons set forth above, the Court holds that HCC did not owe coverage to Morrow as an additional insured under the Policy. Because Morrow was not insured under the Policy, the Court further holds that HCC did not breach the Policy by refusing to defend Morrow in the Underlying Lawsuits. *See Davies v. WTD Holdings, Inc.*, C.A. No. 3:19-cv-02122-JMC, 2020 WL 1703895, at *2 (D.S.C. Apr. 8, 2020) ("To recover for a breach of contract, the party asserting the claim must allege and prove: 1) a binding contract entered into by the parties . . . .") Accordingly, the Court denies Plaintiffs' motion for partial summary judgment, (ECF No. 64), and grants summary judgment in favor of Defendant on Plaintiffs' breach of contract claim.

## B. Bad Faith Claims

In addition to the breach of contract claim, Plaintiffs assert bad faith claims against Defendant. Specifically, Plaintiffs claim Defendant engaged in bad faith by (1) refusing to defend and indemnify Morrow; (2) placing its interests over the interests of Plaintiffs by attempting to bring in additional sources of settlement funds to avoid liability under the Policy; and (3) delaying in making a coverage determination as to Morrow. (ECF No. 57 at ¶ 88. *See also* ECF No. 69 at 13-15.) Plaintiffs further assert that Defendant engaged in bad faith by failing to timely and fairly resolve the claims against Fly & Form in the Underlying Lawsuits. (ECF No. 57 ¶ 89.)

Defendant seeks summary judgment on Plaintiffs' bad faith claims. (ECF No. 60-1.) First, HCC states that it had a reasonable basis to deny coverage for Morrow, as Morrow was not insured under the Policy, and, therefore, it did not act in bad faith in failing to defend and indemnify Morrow in the Underlying Lawsuits. (*Id.* at 24.) Second, HCC states that Plaintiffs have not come forward with evidence that it acted in bad faith or engaged in unreasonable conduct in processing Morrow's claim for coverage under the Policy, or in resolving the Underlying Lawsuits against Fly & Form. (*Id.* at 25-29.)

"The elements of a bad faith refusal to pay action are (1) the existence of a contract of insurance between the parties; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action; and (4) causing damage to the insured." *Crossley v. State Farm Mut. Auto. Ins. Co.*, 415 S.E.2d 393, 396-97 (1992). "[A]n insurer acts in bad faith when there is no reasonable basis to support the insurer's decision [for contesting a claim]." *Helena Chem. Co. v. Allianz Underwriters Ins. Co.,* 357 S.C. 631, 645, 594 S.E.2d 455, 462 (2004). However, where an insurer has a reasonable ground for contesting a claim, there is no bad faith. *Id.* Additionally, this good faith obligation includes an insurer's duty to investigate a claim. *Flynn v. Nationwide Mut. Ins. Co.,* 315 S.E.2d 817, 820 (Ct.App.1984). Importantly, an insured need not prove a breach of an express contractual provision as a prerequisite to bringing a bad faith cause of action. *Tadlock Painting Co. v. Maryland Cas. Co.,* 322 S.C. 498, 504, 473 S.E.2d 52, 55 (1996).

As concluded above, Morrow was not insured under the Policy. The record reflects that after the filing of the Underlying Lawsuits and after receiving Morrow's tenders of defense and indemnity, HCC analyzed whether Morrow was insured and determined that

the Policy did not afford additional insured status to Morrow. Thus, HCC had a reasonable basis for refusing to defend Morrow in the Underlying Lawsuits. Therefore, the Court holds that Defendant is entitled to summary judgment on Plaintiffs' bad faith refusal to pay claim. *See Helena Chem. Co. v. Allianz Underwriters Ins. Co.,* 594 S.E.2d 455, 462 (2004) ("Under South Carolina law, an insurer acts in bad faith when there is *no reasonable basis* to support the insurer's decision.") (emphasis added); *Varnadore v. Nationwide Mut. Ins. Co.*, 345 S.E.2d 711, 714 (1986) (upholding jury instruction charging that "if there *is any reasonable ground* for contesting the claim, there is no bad faith . . . .) (emphasis added).

The Court next considers Plaintiffs' bad faith processing claim.[7] This claim is based on the following allegations: (1) that Defendant placed its interests over Plaintiffs by looking for opportunities to transfer risk to other insurers and parties and by waiting over two years to take a coverage position as to Morrow and (2) that Defendant delayed the resolution of the Underlying Lawsuits, causing Fly & Form to incur additional costs and expenses.  (ECF No. 57 ¶ 89; ECF Nos. 60-30 & 60-31.)

 "[T]here is an implied covenant of good faith and fair dealing in every insurance contract that neither party will do anything to impair the other's rights to receive benefits under the contract." *Tadlock Painting Co.*, 473 S.E.2d at 53 (internal citations and quotation marks omitted.) "[I]f an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance

---

[7] As to Morrow, the Court notes that it is well-established that a bad faith processing claim is not precluded by a finding that the insurer did not breach the insurance contract because the contract did not provide coverage. *See Mixson, Inc. v. Am. Loyalty Ins. Co.*, 562 S.E.2d at 662 ("[T]he covenant of good faith and fair dealing extends not just to the payment of a legitimate claim, but also to the manner in which it is processed.") (citing *Tadlock Painting Co.*, 473 S.E.2d at 53).

contract, he can recover consequential damages in a tort action." *Id.* (quoting *Nichols*, 306 S.E.2d at 619) (emphasis in original). "Bad faith is a knowing failure on the part of the insurer to exercise an honest and informed judgment in processing a claim." 16A Appleman, Insurance Law and Practice Compensatory and Punitive Damages § 8878.25 (1981). "Under South Carolina law, an insurer acts in bad faith where there is no reasonable basis to support the insurer's decision." *Cock-N-Bull*, 466 S.E.2d at 730. As to settlement, an insurer is required to settle a claim if it is the "reasonable thing" to do. *Tyger River Pine Co. v. Md. Cas. Co.*, 170 S.E. 346, 347 (S.C. 1933); *Doe v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 557 S.E.2d 670, 674 (2001) (stating that "a liability insurer owes its insured a duty to settle a personal injury claim covered by the policy, if settlement is the reasonable thing to do.") And if an insurer unreasonably refuses to settle a covered claim within the policy limits, then it will be liable for the entire amount of the judgment obtained against the insured, even if that amount exceeds the policy limits. *See Doe*, 557 S.E.2d 674. Thus, to assess Plaintiffs' bad faith processing claim, the Court must closely examine HCC's handling and resolution of the claims against Plaintiffs in the Underlying Lawsuits.

### Handling of the Claims

On December 30, 2015, Mr. Barriga-Herrera died after being struck by a metal pin that was dropped from approximately 180 feet in the air during erection of the tower crane leased to Fly & Form from Morrow. (ECF No. 69 at 17.) On December 31, 2015, Network Adjusters (hereinafter "Network"), as agent for and on behalf of HCC, opened a file to investigate the accident and to adjust any insurance claims arising under the Policy. (ECF No. 78-12.) Network retained counsel for the Named Insured, Greystar, and it began

confirming which contracting entities had enrolled in the OCIP. (*Id. See also* ECF No. 78-23 at 20.) Network also sought to obtain and review "the contracts that may exist between the parties" involved in the accident to "see if the contracts include any hold harmless, indemnification language, and additional insured requirements in favor of" Greystar. (ECF No. 78-23 at 28-29.)

On January 5, 2016, Lockton informed Network that Fly & Form was enrolled in the OCIP. (*Id.* at 29-30.) According to Network's claim notes dated January 6, 2016, Network "will issue letters to Fly & Form [and other OCIP insureds], to rule out any other available insurance other than the OCIP." (*Id.* at 33-34.) On January 13, 2016, Network learned Morrow was not enrolled in the OCIP, and, according to the claim notes from that day, Network "sought to see if there was any contract that existed that would provide [a] benefit to [Greystar]." (*Id.* at 38-39. *See also* ECF No. 78-27 at 112-13 (HCC's 30(b)(6) deponent testifying that "[o]ur goal was to shift – shift the liability properly to Morrow . . . . It's their crane. This loss involved setting up a crane. They are at least partially, probably a lot more than just partially, at fault in this thing. So it was absolutely necessary – well, absolutely proper, and in my mind necessary – to include Morrow in this case").)

On January 20, 2016, Morrow's counsel made a demand to Fly & Form against Fly & Form's insurers for defense and indemnity in the event suit is filed against it because of the accident. (ECF No. 60-8 at 17-18.) On January 27, 2016, Fly & Form shared a copy of Morrow's demand letter with Greystar and requested a copy of the Policy for the Project showing all coverages. (ECF No. 60-12 at 2 (stating that "Morrow has made a demand against our coverage regarding the accident, and we need to include the site policy in our notification to our carriers").) On January 28, 2016, Greystar shared a copy of Morrow's

January 20, 2016, demand letter to Fly & Form with Network. (ECF No. 60-13 at 2.) The next day, Network responded to Greystar, pointing out that the demand letter was not a demand under the Policy, but a demand for defense and indemnity from Fly & Form's insurers under Fly & Form's policy. (ECF No. 60-15 at 2. *See also* ECF No. 78-23 at 46 (claims adjuster testifying that Network's claim notes reflect that "Landmark and Travelers will likely respond to their insured's request for coverage").) Thus, at this time, HCC did not provide a response to Morrow's regarding its January 20, 2016, tender letter to Fly & Form. (ECF No. 78-23 at 52-53 (claims adjuster testifying that if there is no claim note indicating a tender response was sent, then it was not sent and further testifying that, "Yeah, I probably should have responded to that tender").) On February 3, 2016, Network provided a copy of the Policy to Fly & Form as requested. (ECF No. 60-17 at 3; ECF No. 78-11 at 12.)

According to Network's claim notes dated May 3, 2016, Fly & Form's insurer inquired via email to Network whether OCIP coverage would be provided to Morrow "if suit is filed and Fly & Form Structure is named in the suit." (ECF No. 78-11 at 16.) The claim notes state that Fly & Form's insurer will follow up on this inquiry in a written letter. (*Id.*)[8] The notes also reflect that Network informed Fly & Form's insurer that her inquiry

---

[8] Plaintiffs assert that "on May 3, 2016, Morrow sent a second tender to HCC for defense and indemnity." (ECF No. 69 at 20.) The cite provided in support of this assertion, however, cites to these claim notes (as Exhibit 75) and the deposition transcript of claims adjuster, Bernadette Colen, (as Exhibit 109), wherein Colen answered "correct" when asked if this inquiry by Fly & Form's insurer to Network "is the same thing we looked at that had been asked in January." (ECF No. 78-23 at 57-58.) The record before the Court does not contain a tender letter from Morrow to HCC or a second tender letter from Morrow to Fly & Form dated on or around May 3, 2016. Moreover, the January 20, 2016, letter speaks for itself and is a tender letter from Morrow to Fly & Form seeking coverage under Fly & Form's policy, not Greystar's Policy. (*See* ECF No. 60-8 at 17-18.) Accordingly, the Court finds no evidence in the record to support Plaintiffs' assertion that Morrow sent a second tender letter to HCC on May 3, 2016, seeking defense and indemnity under the Policy. (ECF No. 69 at 20.) As such, the Court does not address Plaintiffs' assertion that HCC acted in bad faith when it failed to respond to Morrow's "second tender to HCC." (ECF No. 69 at 20.)

would have to reviewed, and then the notes state, internally, that Network "would need to [sic] complete copies of their contracts and then do a complete analysis if [Morrow] would qualify for AI status even though not enrolled [in the OCIP]." (*Id.*) The claim notes from December 2016, indicate that Network was still trying to obtain copies of all relevant contracts, to include those between Enrolled Contractors and non-enrolled subcontractors. (*Id.* at 28.)

On August 29, 2017, Network (on behalf of HCC) sent a ROR letter to Fly & Form, stating that, "[a]s an Enrolled Contractor, Fly & Form [] is an insured under th[e] Policy" and is obligated to cooperate in its investigation of this loss and requesting a copy of "contracts/purchase agreements between Fly & Form and . . . Morrow." (ECF No. 64-13.)

On October 20, 2017, the first Underlying Lawsuit was filed against various contractor defendants, including Morrow and Greystar, asserting that Mr. Barriga-Herrera was killed in an accident during the erection of the tower crane at the Project. (ECF No. 57 ¶ 43.) Fly & Form was added as a defendant in an amended complaint filed on November 16, 2017. (*Id.* ¶¶ 43-44.)

On November 17, 2017, after the filing of the first lawsuit, Morrow's counsel sent a second tender letter to Fly & Form's insurers, seeking defense and indemnity from Fly & Form under Fly & Form's policy for all claims arising out of the accident pursuant to the lease agreement between it and Fly & Form. (ECF No. 60-8 at 21-22.) On November 21, 2017, Fly & Form's counsel shared this second letter with Network, stating: "Please advise who you have retained to defend this case and confirm that a defense and indemnity will be provided for Morrow." (ECF No. 60-18 at 3.) On November 28, 2017, Fly & Form's counsel emailed Network a copy of the amended complaint and service of

process it received and sought coverage for itself under the Policy, stating: "Please confirm that you will be picking up the defense of Fly & Form." (ECF No. 60-18 at 2.) This email also indicated that Fly & Form's counsel had missed a call from a Network adjuster to discuss Morrow and that a follow up call will occur on November 29, 2017. (*Id.*) In response, HCC assigned counsel to defend Fly & Form. (ECF No. 69 at 22; ECF No. 60-1 at 12.)

Morrow's counsel sent a third and final tender letter to Fly & Form on January 25, 2018, after Morrow was served with the complaint, demanding "**an immediate defense and indemnity for all claims alleged in the Suit and any and all additional claims arising out of the accident, under all applicable policies**." (ECF No. 60-8 at 19-20 (emphasis in original). *See also id.* at 20 ("Under Section 6 and 7 of the Lease, Fly& Form agreed to provide a complete indemnity to Morrow for the claims asserted in the Amended Complaint and to insure against such losses under its liability policies" with Landmark American Insurance and Travelers Excess and Surplus Lines.)) On February 12, 2018, Fly & Form's counsel shared this third letter with Network, stating: "Please confirm that you will undertake the defense and indemnity of Morrow Equipment as an Additional Insured under the [P]olicy." (ECF No. 60-21 at 3-4.)

According to HCC, Morrow did not seek coverage under the Policy until January 30, 201**8**. (ECF No. 60-1 at 12) (emphasis added.) In support of this assertion, HCC cites to a January 30, 2018, email from Network to Morrow's counsel, stating that Network is "reviewing your tender of Morrow Equipment Company to Fly & Form." (ECF No. 60-19 at 2.)[9] That same day (January 30, 2018), Morrow's counsel responded, stressing that it

---

[9] The Court notes that this email does not include a date of the tender letter referenced, and no tender letter was attached to the email. (ECF No. 60-19 at 2.) Thus, from the three letters Morrow sent to Fly & Form, it

"needs an answer as quickly as possible [on coverage] given the deadline for filing responsive pleadings." (ECF No. 60-19 at 2.) On February 23, 2018, Network responded via a formal letter to Morrow's counsel (with copy to Fly & Form), which stated in relevant part:

> There is no coverage for the defense or indemnity of Morrow under this policy with HCC. Morrow was not an "enrolled contractor" as defined above. In addition, Morrow is not an Additional Insured under this policy as there was no contract between Greystar Development & Construction, LP and Morrow. The Commercial General Liability form notes that the words "you" and "your" refer to the Named Insured shown in the Declarations. Greystar Development & Construction, LP is the Named Insured. Fly & Form is not a Named Insured under this policy.

(ECF No. 60-20 at 8.) In conclusion, the letter stated that "[s]ince there is no coverage for Morrow under the HCC policy, we have no duty to defend or indemnify in this matter." (*Id.*) Counsel for Fly & Form requested that Network reconsider its position; therefore, Network retained coverage counsel to review the matter. (ECF No. 60-1 at 12-14; ECF No. 60-21 at 2.) On March 15, 2018, coverage counsel sent a letter to Fly & Form and Morrow, further explaining HCC's position that the Policy does not provide coverage for Morrow. (ECF No. 60-24.)

On July 6, 2018, the second Underlying Lawsuit was filed naming Plaintiffs as defendants, among others. (ECF No. 57 ¶ 43.) In an August 8, 2018, letter, Morrow tendered to HCC the claims asserted in this second action, and Morrow also responded to HCC's coverage counsel's March 15, 2018, letter. (ECF No. 60-25.) On September 7, 2018, coverage counsel for HCC sent a letter to Morrow, denying coverage for Morrow

---

is unclear from this January 30, 2018, email which tender letter HCC reviewed. (*Id.*) In any event, the record indicates that a letter dated January 20, 2018, was sent directly to Network from Morrow's counsel regarding Morrow's tender request to Fly & Form. (*See, e.g.,* ECF No. 60-21 at 2 (March 2, 2018, email indicating that Network had received a letter from Morrow's counsel, Brett Spain, dated January 20, 2018)).

under the Policy based on the same reasons set forth in its February 23, 2018, letter. (ECF No. 60-26.) Thus, Fly & Form defended Morrow in the Underlying Lawsuits "pursuant to its contractual promise to indemnify." (ECF No. 69 at 22.)

Plaintiffs assert that HCC's conduct above establishes multiple, genuine issues of material fact from which a jury could conclude that HCC acted in bad faith. Specifically, Plaintiffs take issue with the fact that HCC (1) did not respond to Morrow's first tender letter to Fly & Form dated January 20, 2016; (2) did not retain counsel for Plaintiffs after the accident or for Fly & Form shortly after Lockton confirmed Fly & Form was enrolled in the OCIP (*id.* at 17-18); (3) did not consider whether Morrow was an additional insured under the Policy after learning on January 13, 2016, that Morrow was not enrolled in the OCIP (*id.* at 19); (4) sought to involve Morrow's insurance company (*id.*); and (5) examined the subcontract between Greystar and Fly & Form "with regard to indemnification, hold harmless, and additional insured requirement or lack thereof." (*Id.* at 18-19; ECF No. 78-23 at 64-65.) Notably, Plaintiffs' memorandum is devoid of case law supporting that any of the aforementioned conduct constitutes bad faith or unreasonable action in processing a claim under South Carolina law. (*See generally* ECF No. 69 at Section II.)

"Bad faith is a knowing failure on the part of the insurer to exercise an honest and informed judgment in processing a claim." *Am. Fire & Cas. Co. v. Johnson*, 504 S.E.2d 356, 358 (Ct. App. 1998). Summary judgment is warranted where the insurer can prove that its actions were reasonable based "on all the evidence available in the case." *Snyder v. State Farm Mut. Auto Ins. Co*., 586 F. Supp. 2d 453, 460 (D.S.C. 2008).

The Court has carefully reviewed the record and finds the only reasonable inference from the evidence is that HCC did not act in bad faith when it engaged in the conduct outlined above. First, HCC was not obligated to respond to a tender letter sent by Morrow to Fly & Form, wherein Morrow demanded a defense and indemnity, **not** from Greystar's Policy with HCC, but from Fly & Form's policy with Fly & Form's insureds. The January 20, 2016, letter was not directed to HCC and, while it was shared with HCC and Network's claims adjuster testified that she "probably" should have responded to it, HCC's failure to do so is not unreasonable. At this time, no lawsuit had been filed, and no tender requests for coverage under the Policy had been made to HCC by Plaintiffs. Further, given these facts and the fact that Network had just started its investigation into the accident, the Court finds it reasonable that HCC only retained counsel for its Named Insured at this early juncture. Significantly, after the first lawsuit was filed (and amended to name Fly & Form as a defendant) and after Fly & Form sought coverage from HCC under the Policy, HCC promptly retained counsel to defend Fly & Form.

Second, the record indicates that, after the first lawsuit was filed and after service of the complaint on Morrow, Morrow directed a letter to Network regarding its tender request, which Network reviewed on or around January 30, 2018. Notably, Network timely responded to Morrow – within one month of receipt – with HCC's coverage position: that there is no coverage for the defense or indemnity of Morrow under the Policy. Plaintiffs have not set forth any convincing argument or case law to support that HCC acted in bad faith by failing to conduct a coverage review as to Morrow's additional insured status under the Policy **prior to** receiving a demand for coverage under the Policy from Morrow. The record also reflects that, after the second lawsuit was filed – and in stark contrast to

the prior sharing of Morrow's tender requests by Fly & Form to HCC – Morrow indisputably tendered to HCC the claims asserted in the second lawsuit via an August 8, 2018, letter addressed to HCC. Notably, a timely response was once again provided to Morrow – within one month of receipt – by coverage counsel for HCC, denying coverage for Morrow under the Policy.

Lastly, the Court is not convinced that HCC engaged in bad faith by wanting to involve Morrow's insurer(s), if any, and by wanting to examine all relevant contracts between its Named Insured and the subcontractors involved in the accident. Morrow was the owner of the tower crane, and the metal pin that ultimately killed Mr. Barriga-Herrera fell during the erection of the tower crane. (ECF No. 60-1 at 7.) Moreover, a technician from Morrow was on site at the time to provide technical support and assistance. (ECF No. 69 at 2.) Thus, it was evident from the outset that Morrow had liability exposure. Given these facts, the Court finds it reasonable that Network would seek to understand what insurance contracts Morrow may have entered pertaining to the Project. Indeed, given the circumstances, it seems a **failure** to review or at least inquire about such contracts may support a bad faith processing claim, as such agreements often contain important language addressing coverage questions that arise when several entities, insurers, and policies are involved.

For the foregoing reasons, the Court finds that the evidence, when viewed in a light most favorable to Plaintiffs, does not support a finding that Defendant engaged in bad faith claims handling.

**Resolving the Underlying Lawsuits**

HCC mediated the Underlying Lawsuits on February 27, 2019. (ECF No. 69 at 29.)
The most HCC offered at this mediation was $█. (*Id.* at 27.) Prior to mediation, counsel
for the Estate of Mr. Barriga-Herrera sent a settlement demand to all defendants, stating
in relevant part that "the most capable parties to Mr. Barriga's death are the Allstate
Crane, Linton Mechanical and Morrow Equipment Company employees" and making an
opening demand of $█. (ECF No. 60-32 at 3.) Thus, the Estate's demand was well in
excess of HCC's policy limits, and counsel for HCC did not value the Underlying Lawsuits
at the full $2,000,000.00 policy limits. (ECF No. 60-35 at 24.) A second mediation took
place on October 29 and 30, 2019, and HCC settled the claims against Fly & Form, as
well as Greystar and another insured under the Policy, for $█.

Fly & Form contends that HCC was unprepared to meaningfully participate at the
first mediation on February 27, 2019. (ECF No. 69 at 29.) According to Fly & Form, HCC
"was prepared by January of 2017, by virtue of its reserves, to pay $█ to settle the claims
against the OCIP insureds." (*Id.*) Thus, Fly & Form claims that HCC should have offered
more than $█ at the first mediation. (*Id.*) Fly & Form also relies on HCC's 30(b)(6)
testimony wherein the deponent stated:

> So no one really goes in expecting to pay any money during a first mediation
> . . . . it's pretty common to go in with the idea that, hey, if they came to us
> with a number that was so insanely good that we couldn't pass it up, we're
> there, but I think we've got other work to do today.

(*Id.* (quoting ECF No. 78-27 at 139).) Fly & Form points out that, at the second mediation,
on October 29 and 30, 2019, HCC ended up paying 6 times the amount it had offered at
the first mediation. (*Id.*) Fly & Form claims that during the eight-month period in between

mediations, Fly & Form paid more than $22,000.00 in litigation costs to defend the claims against Morrow. (*Id.*)

In response, HCC argues that there is "no bad faith when the insurer offers less than the full amount demanded on the claim" (ECF No. 60-1 at 28), citing to *Collins v. Auto-Owners Ins. Co.*, where the court granted insurer's summary judgment motion as to the bad faith claims where it did not settle the case by offering full valuation of claim because parties were $900,000.00 apart. 759 F. Supp. 2d 728, 741-42 (D.S.C. 2010), *aff'd*, 438 F. App'x 247 (4th Cir. 2011). HCC states that settlement "turned on whether the insurers for Allstate and Linton would offer more money, not HCC." (ECF No. 60-1 at 28.)

Whether an insurer has unreasonably refused to settle, turns on the totality of the circumstances and is a question for the jury, "[s]o long as there is sufficient evidence in support of a bad faith claim on which a rational factfinder could return a verdict for the insured." *Columbia Ins. Co. v. Reynolds*, 438 F. Supp. 3d 614, 620 (D.S.C. 2020), *aff'd sub nom. Columbia Ins. Co. v. Waymer*, 860 F. App'x 848 (4th Cir. 2021) As stated in *Collins*:

> [I]f there is a reasonable ground for offering less than the full amount demanded on a claim, then there is no bad faith in negotiations. Whether an offer is reasonable and made in good faith must be tested based on what was known at the time. It must also consider the very nature of negotiations.

759 F. Supp. 2d at 740. As further explained in *Snyder v. State Farm Mutual Auto. Ins. Co.*:

> . . . it is not the role of the courts to impose rigid rules and guidelines upon the conduct of parties in the settlement process. Settlement negotiations are best served by as much flexibility as possible so long as the parties are negotiating in good faith, as this allows both parties to make proposals which are best suited to serve their particular needs. Artificial constraints or requirements placed upon the options available to the bargaining parties

would generally only serve to frustrate attempts to reach a mutually agreeable settlement.

586 F. Supp. 2d 453, 460 (2008).

Here, reviewing the record in the light most favorable to Fly & Form, the Court finds no reasonable jury could find that HCC acted in bad faith or unreasonably when it refused to offer more than $█ at the first mediation. While it is evident that HCC planned to (and ultimately did) pay more than it had initially offered (but less than policy limits), it is equally evident that the OCIP defendants were not the target of the Underlying Lawsuits and that the parties were faced with a substantial difference in demand/offer figures at the outset of the first mediation. The Estate was looking to four sources of money from four different entities for settlement purposes, but it believed Allstate, Linton and Morrow should share the lion's share as the most culpable parties. Given these circumstances, the Court is not persuaded that a reasonable jury would fault HCC for slow playing its hand and waiting to offer up its reserves – or more – until it was able to get a good feel for the amounts Allstate, Linton, and Morrow were willing to contribute towards settlement. By the time of the second mediation, the record indicates that the other two parties were willing to increase their offers, as was HCC in response to their movement, such that all the named defendants in the Underlying Lawsuits were able to resolve the claims. (ECF No. 60-34 at 2; ECF No. 69 at 29; ECF No. 60-1 at 28.)

Given the above, the Court finds that HCC settled the case within policy limits for its OCIP insured, Fly & Form, when it believed it was reasonable to do so – i.e., when the other, more culpable parties agreed to contribute more towards the settlement and the gap between the respective parties' amounts drew nearer. It is Plaintiffs' burden to prove bad faith, and Plaintiffs have not provided any case law supporting that HCC's conduct in

these circumstances constitutes bad faith or was unreasonable, even if HCC ultimately paid 6 times more than what it had initially offered. After careful consideration of the parties' respective positions as well as the case law set forth above, the Court finds that Defendant's conduct in resolving the Underlying Lawsuits was reasonable under the circumstances.

Accordingly, for all the reasons set forth above, the Court holds that Defendant is entitled to summary judgment on Plaintiffs' bad faith claims.

## C. Estoppel and Waiver Claims

Lastly, Plaintiffs assert estoppel and waiver claims against Defendant. (ECF No. 69 at 22.) Specifically, Plaintiffs claim that "Defendant is estopped from relying on the bases for denying coverage that it set forth in the tardy letters of February 23, 2018, March 15, 2018 and September 7, 2018, from Network Adjusters." (ECF No. 57 ¶ 100.) Plaintiffs further claim that Defendant waived its ability to deny coverage to Morrow on the bases set forth in these tardy letters because the August 29, 2017, ROR letter to Fly & Form was insufficient in explaining "why coverage might not exist [as to Morrow] under the Policy" and by delaying over two years to issue a coverage denial letter to Plaintiff Morrow." (ECF No. 69 at 22-27.) HCC moves for summary judgment on these claims, arguing that Plaintiffs have failed to meet their burden to prove estoppel or waiver. (ECF No. 60-1 at 29-33.)

"In appropriate circumstances, estoppel can be used to prevent the insurer from denying coverage to the insured." *Stringer v. State Farm Mut. Auto. Ins. Co.*, 687 S.E.2d 58, 61 (S.C. Ct. App. 2009) (citing *Koren v. Nat'l Home Life Assurance Co*., 288 S.E.2d 392, 394 (1982)).

> The essential elements of estoppel as related to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, the essential elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) prejudicial change in position.

*S. Dev. Land & Golf Co. v. S.C. Pub. Serv. Auth.*, 426 S.E.2d 748, 750 (1993) (internal citations omitted). Further, "the reliance by the party claiming estoppel must be reasonable, and it must proceed in good faith." *Provident Life & Acc. Ins. Co. v. Driver*, 451 S.E.2d 924, 928 (S.C. Ct. App. 1994) (citing *S. Dev. Land & Golf Co.*, 426 S.E.2d at 751).

Waiver is the voluntary and intentional relinquishment of a known right. *Janasik v. Fairway Oaks Villas,* 415 S.E.2d 384, 387 (1992). "Waiver . . . may be implied from circumstances indicating an intent to waive." *Bonnette v. State*, 282 S.E.2d 597, 598 (1981). Acts that are inconsistent with the continued assertion of a right may also give rise to a waiver. *Bonnette*, 282 S.E.2d at 598.

As a general rule, insurance coverage may not be expanded or created by waiver or estoppel. *Campbell, Inc. v. N. Ins. Co. of New York*, 769 (D.S.C. 2004). *See, e.g., Portrait Homes - S.C., LLC v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* No. 2020-000735, 2023 WL 8610277, at *27 (S.C. Ct. App. Dec. 13, 2023) ("'[W]aiver cannot create coverage and cannot bring into existence something not covered in the policy.'" (quoting *Laidlaw Env't Servs. (TOC), Inc. v. Aetna Cas. & Sur. Co.*, 524 S.E.2d 847, 852 (Ct. App. 1999))).

Given the Court's finding above that HCC did not act in bad faith or unreasonably regarding the timing and substance of its coverage determination as to Morrow, it further holds that the letters sent by HCC to Morrow in 2018 were not "tardy" or "delayed." Rather, as set forth above, HCC provided its coverage position to Morrow's counsel after receipt of two tender requests from Morrow's counsel. Further, HCC provided a copy of the Policy to Fly & Form on February 3, 2016, from which Fly & Form could have gleaned that Morrow was not covered under the Policy as an additional insured. Moreover, upon a request from Fly & Form to reconsider its coverage position as to Morrow, HCC retained coverage counsel to conduct another review of the Policy and coverage counsel timely shared his analysis and findings (denying coverage to Morrow) with Morrow and Fly & Form. Lastly, since Morrow was not entitled to coverage under the Policy, the Court disagrees with Plaintiffs' contention that the August 29, 2017, ROR letter to Fly & Form was insufficient because it failed to reference the AI Endorsement or explicitly state that Fly & Form was not a Named Insured under the Policy. (ECF No. 69 at 23.) The letter was sent to provide notice to Fly & Form regarding its coverage and obligations under the Policy as an Enrolled Contractor, not to give notice to Fly & Form regarding possible coverage, or lack thereof, under the Policy for its subcontractor, Morrow. At this time, no lawsuit had been filed due to the accident, and Morrow had not sought coverage under the Policy. Thus, even if HCC was aware that Fly & Form desired or expected Morrow to be covered under the Policy, the Court is not persuaded by Plaintiffs' argument that HCC should have included a coverage determination as to Morrow in its ROR letter to Fly & Form. Upon review, the Court finds that this letter adequately gave notice to Fly & Form regarding its coverage (as an insured due to being an Enrolled Contractor) and its

obligations under the Policy, with complete citations to relevant portions of the Policy. Accordingly, the Court holds that the ROR that HCC sent to Fly & Form was sufficient. Given these findings, the Court is not persuaded by Plaintiffs' insufficiency arguments based on *Harleysville Grp. Ins. v. Heritage Cmtys., Inc.*[10]

In conclusion, the Court does not find the case at bar to be one in which it would be proper to set aside the general rule that disallows equitable estoppel and waiver in insurance policy disputes. Accordingly, the Court holds that neither the timing of HCC's coverage determination as to Morrow nor the ROR letter to Fly & Form confer additional insured coverage to Morrow through estoppel or waiver.

## IV.    CONCLUSION

Based on the foregoing, the Court denies Plaintiffs' motion for partial summary judgment, (ECF Nos. 61, 64), and grants Defendant's motion for summary judgment, (ECF No. 60).

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

January 24, 2024
Charleston, South Carolina

---

[10] 803 S.E.2d 288, 296 (2017) (holding that "a [ROR] letter that merely provides the insured with a copy of the policy, coupled with a general statement that the insurer reserves all of its right is [not] sufficient"). *See also id*. at 297 ("We agree with the Special Referee that generic denials of coverage coupled with furnishing the insured with a copy of all or most of the policy provisions (through a cut-and-paste method) is not sufficient.")